# Richmond.

## NORFOLK AND WESTERN RAILWAY Co. v. STUART'S DRAFT MILLING Co.

### January 14, 1909.

1. CARRIERS—*Interstate Shipments—Loss of Goods—Liability of Initial Carrier—Warehousemen.*—The Act of Congress of June 29, 1906, makes the initial carrier of goods, who issues a through bill of lading on interstate shipments, liable for losses occurring on connecting lines, any "contract, receipt, rule or regulation" to the contrary notwithstanding. If the constitutionality of this act be conceded, still the acts of the connecting carrier for which the initial carrier is made liable are acts as carrier, and not as warehouseman. If the goods have reached their destination, and the consignee, after ample notice, has failed and neglected to receive them for an unreasonable time, the liability of the connecting carrier ceases, and it becomes a mere warehouseman, and for its acts or negligence as warehouseman the initial carrier is not liable.

Error to a judgment of the Circuit Court of Augusta county in an action of assumpsit. Judgment for the plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*Theodore W. Reath* and *Sipe & Harris,* for the plaintiff in error.

*Turner K. Hackman,* for the defendant in error.

Whittle, J., delivered the opinion of the court.

The following are the essential facts in this case: The defendant in error, the Stuart's Draft Milling Company, which was the plaintiff in the trial court, is a domestic corporation, engaged in the manufacture and sale of flour at Stuart's Draft, in Augusta county, Virginia.    The plaintiff in error, the Norfolk and Western Railway Company, which was the defendant in the lower court, is likewise a Virginia corporation, a common carrier employed in both intrastate and interstate commerce. Its road extends through the State of Virginia, and into the States of Maryland, West Virginia, Ohio, Tennessee and North Carolina.

The southern terminus of the Winston-Salem division of the company's line is at the city of Winston-Salem, in the State of North Carolina.

On November 16, 1906, the defendant received from the plaintiff a carload of flour consigned to the order of itself, to be transported to Gaffney, South Carolina, with direction to notify W. C. Carpenter of that place.    In the bill of lading issued to the plaintiff it was specifically agreed that no carrier should be liable for loss or damage to the consignment not occurring on its own road, and on its own portion of the through route.    It was also agreed that the bill of lading was signed for the different carriers, who might engage in the transportation of the carload of flour, severally and not jointly, each to be bound by and to have the benefit of the provisions thereof; and the plaintiff agreed that in accepting the bill of lading it should be bound by all of its stipulations, conditions, and exceptions, whether written or printed.

The defendant promptly transported the flour to the terminus of its road at Winston-Salem; and on November 18, 1906, delivered the consignment to its connecting carrier, the Southern Railway Company, without any loss or damage hav-

ing been done thereto while in the possession of the defendant, or in the course of transportation over its road. The Southern Railway Company, in like manner, promptly transported the flour, without loss or damage in transportation, over its route to the point of destination at Gaffney, South Carolina, and was ready to deliver it to W. C. Carpenter, the consignee designated by the plaintiff, on November 22, 1906. Carpenter was immediately notified of the arrival of the car, and, from day to day, promised to receive and unload the flour, requesting the Southern Railway Company to suffer the car to remain on the track for that purpose. The consignee, pending the delay, from time to time renewed his promises to receive the consignment, and craved additional indulgence from the Southern Railway Company. The plaintiff in the mean time instructed its brokers to look after Carpenter in connection with the shipment, and subsequently sent its traveling salesman to Gaffney for that purpose. Finally, the plaintiff, on May 7, 1907, directed the defendant to have the flour reshipped to it at Stuart's Draft, at regular rates, all charges following, and delivered to the defendant the original bill of lading for that purpose. The defendant communicated the direction to the Southern Railway Company, and was advised by that company that on March 7, 1907, after due notice to W. C. Carpenter and upon his ultimate refusal to present the bill of lading and pay the carrier's charges and accept the flour, it was placed in the company's warehouse, and afterwards sold to satisfy the lien thereon. The balance which remained after payment of carrier's charges and costs of sale was tendered to the plaintiff and refused.

The defendant had no knowledge of any of these transactions until it was apprised of them by the Southern Railway Company on June 21, 1907, when it forthwith notified the plaintiff.

Whereupon, this action was brought against the defendant in its capacity of common carrier, to recover damages for the

loss of the flour.   The case was submitted to the court without the intervention of a jury, upon agreed facts, and to a judgment in favor of the plaintiff fixing liability on the defendant for the loss sustained, this writ of error was allowed.

The plaintiff rests its right of recovery exclusively upon the Carmack Amendment of section 20 of the act of Congress to regulate commerce, passed June 29, 1906.   The amendment provides: "That any common carrier, railroad, or transportation company receiving property for transportation from a point in one State to a point in another State, shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule or regulation shall exempt such common carrier, railroad or transportation company from the liability hereby imposed:   *Provided,* that nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law.   That the common carrier, railroad, or transportation company issuing such receipt or bill of lading shall be entitled to recover from the common carrier, railroad, or transportation company on whose line the loss, damage or injury shall have been sustained the amount of such loss, damage, or injury as it may be required to pay to the owners of such property, as may be evidenced by any receipt, judgment, or transcript thereof." 34 U. S. Stat. Pt. 1, p. 595.

There is much force in the contention that this amendment is in violation of the V and XIV Amendments of the Constitution of the United States, which forbid that either Congress or any of the States "shall deprive any person of life, liberty or property without due process of law, nor shall private property be taken for public use without just compensation."

In that connection it is insisted that the imposition upon the defendant, as initial carrier, of liability for loss, damage, or injury of the flour occasioned by the act, neglect or default of the Southern Railway Company, or any other connecting carrier over whose line the flour passed, deprives the defendant of its property without due process of law.

The importance of this question can hardly be overstated; yet, in the view which we take of the case, it is not necessary to consider or decide the constitutionality of the amendment. Assuming that it was within the competency of Congress and is constitutional, it is obvious, under the conceded facts, that the case in judgment does not fall within its terms. The flour was promptly transported over the respective lines of the initial and connecting carrier to Gaffney, South Carolina, the point of destination, without loss, injury, or damage, and upon its arrival on November 22, 1906, Carpenter, the consignee named by the plaintiff, was duly notified. He promised to receive and unload the goods, and requested that the car be left on the Southern Railway's track for that purpose.

By clause 5 of the bill of lading, it was made the duty of the plaintiff promptly to have accepted the flour and paid the carriers' charges thereon. Moreover, unless removed within twenty-four hours after its arrival at destination, the Southern Railway Company could keep it in the car, depot or place of delivery of the company at the sole risk of the owner, or, at its option, remove and otherwise store the goods at the owner's risk and cost, to be held subject to the carrier's lien for all freight and other charges.

The plaintiff knew of Carpenter's attitude with regard to the shipment; and, as we have seen, the Southern Railway Company forbore to enforce its lien from November 22, 1906, until March 7, 1907. The time allowed the plaintiff within which to accept and remove the flour was greatly in excess of the period fixed by the bill of lading, or of a reasonable time.

There was, as observed, no loss, damage, or injury to the goods while on the line of the connecting carrier as contemplated by the Carmack Amendment; and the flour was not sold until long after the Southern Railway Company's liability as carrier had terminated, and the new relation of warehouseman had been forced upon the company by the negligence of the plaintiff.

It is not infrequently a question of some nicety to determine the precise point of time at which the liability of a railroad company as carrier ceases and that of warehouseman begins; but no such difficulty confronts us in this instance, either from the standpoint of contract or of the general law applicable to carriers.

In *Ala. & Tenn. Rivers R. Co.* v. *Kidd,* 35 Ala. 209, the doctrine is stated as follows: "If goods are transported by railroad, consigned to the owner or a third person, and are not called for by the consignee when they arrive at their destination, or within a reasonable time thereafter, and are then deposited by the railroad company in one of its own warehouses, to be kept for the owner or consignee, the company ceases to be liable as a common carrier, and becomes liable only as a warehouseman, or bailee; and if the company has no warehouse at that place, it may deposit the goods in the warehouse of a responsible third person, for and on account of the owner or consignee, and thus put an end to its liability as a carrier."

That case also holds that it is as much a part of the contract that the owner or consignee of goods shall be ready at the place of destination to receive them on their arrival, or within a reasonable time thereafter, as that the carrier shall transport and deliver them.

In 6 Cyc. 455, it is said: "The carrier remains liable until the goods have reached their destination, and the consignee has had reasonable opportunity (involving notice of arrival when such notice is essential to charge him with the duty of taking

the goods), to receive the goods from the carrier, and that, after the expiration of such reasonable time, the liability of the carrier, if the goods remain in his possession, is that of warehouseman only. The carrier is liable only as warehouseman after the consignee has refused to receive the goods, or while the goods are held by the carrier at the request and at the convenience of the consignee." *Pendell* v. *The St. Louis & Hannibal Ry. Co.,* 41 Mo. App. 84; *Chesapeake & Ohio Ry. Co.* v. *Beasley,* 104 Va. 788, 52 S. E. 566, 3 L. R. A. (N. S.) 183.

There can be no doubt of the correctness of the general principle embodied in the preceding statements of the law, and it is conclusive of this case, because the vicarious liability sought to be fastened upon the defendant is for the acts of the connecting carrier as carrier and not as warehouseman.

For these reasons the judgment of the circuit court must be reversed, and the case remanded for further proceedings.

*Reversed.*